## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) |
|  | ) Chapter 15 |
| PT HOLDCO, INC., *et al.,*[1] | ) |
|  | ) Case No. 16-10131(___) |
|  | ) |
| Debtors in a Foreign Proceeding. | ) (Joint Administration Requested) |
|  | ) Re: D.I. 3, 4, and 5. |

### DECLARATION OF NIGEL D. MEAKIN

I, Nigel D. Meakin, hereby declare that the following is true and correct to the best of my knowledge, information and belief.

1.    I am a Senior Managing Director of FTI Consulting Canada Inc. ("FTI"), the court-appointed monitor (in such capacity, the "Monitor") and duly authorized foreign representative (in such capacity, the "Foreign Representative") for Primus Telecommunications Canada Inc., Primus Telecommunications, Inc., Lingo, Inc., PT Holdco, Inc., and PTUS, Inc. (collectively, the "Debtors" or "Primus Entities") in Canadian insolvency proceedings (the "Canadian Proceeding"), pending in Toronto, Canada before the Ontario Superior Court of Justice (Commercial List) (the "Canadian Court")[2].  FTI was appointed as Monitor of the Debtor pursuant to the provisions of Canada's Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36 (the "CCAA"), the insolvency statute under which the Debtors have been granted relief

---

[1] The last four digits of the Employer Identification Number or Canadian Business Number, as appropriate, for each debtor follow in parentheses: PT Holdco, Inc. (3731), PTUS, Inc. (0542), Primus Telecommunications, Inc. (4563), Lingo, Inc. (7778), and Primus Telecommunications Canada, Inc. (5618).

[2] The Monitor was appointed as monitor of the Debtors pursuant to provisions of Canada's Companies' Creditors Arrangement Act (the "CCAA"), R.S.C. 1985, c. C-36, the statute under which the Debtors have been granted relief from creditors.  An initial order was entered on January 19, 2016 in the Ontario Superior Court of Justice by the Honourable Mr. Justice Penny, in the matter of a Court File No. CV-16-11257-OOCL Plan of Compromise or Arrangement of PT Holdco, Inc., Primus Telecommunications Canada Inc., PTUS, Inc. Primus Telecommunications, Inc., and Lingo, Inc. ("Initial Order").

from creditors.  As such, I have personal knowledge of the statements contained in this affidavit. Where I have relied upon other sources for information, I have referred to such sources and I verily believe them to be true.

2.      I respectfully submit this declaration (the "Declaration") in support of the Foreign Representative's Verified Petition for Recognition of Foreign Proceeding and Related Relief (the "Petition for Recognition").

3.      Attached as **Exhibit A** is a true and correct copy of the Initial Order issued by the Canadian Court in the Canadian Proceeding on January 19, 2016 (the "Initial CCAA Order").

4.      Attached as **Exhibit B** is a true and correct copy of each of the following documents filed in the Canadian Proceeding:

> a)    *Affidavit of Michael Nowlan sworn to on January* 18, *2016* (the "Nowlan Affidavit") and related exhibits; and

> b)    *Application of the Primus Entities pursuant to the CCAA.*

**OVERVIEW OF THE APPLICABLE CCAA PROCESS**

5.      The CCAA provides for a controlled procedure designed to enable financially distressed companies to avoid foreclosure or seizure of assets while maximizing the company's value for the benefit of creditors and other parties in interest (a "CCAA Proceeding").

6.      A CCAA Proceeding is an insolvency proceeding in which the debtor reorganizes or liquidates its business and distributes proceeds to creditors under court supervision.  The debtor's assets and affairs are subject to the supervision of the Canadian Court during the pendency of a CCAA Proceeding.

7.      In a CCAA Proceeding, absent exceptional circumstances, the debtor's management and board of directors remain in place, and the board maintains its power under

Canadian law to approve significant actions, including disposing of important assets, borrowing significant amounts, or changing corporate structures, subject to oversight by a court-appointed monitor and consent of the court.

8.    Upon the commencement of a CCAA Proceeding, the court will appoint a qualified monitor, who functions as an officer of the CCAA court and an independent observer of the CCAA Proceeding and the debtor's business and (i) monitors the company's ongoing operations, (ii) reports to the court on any major events affecting the company, (iii) notifies the company's creditors of any meetings and tabulates votes at these meetings, if held, (iv) assists in preparing, filing, and holding meetings for voting on the plan of arrangement or compromise, (v) approves the disclaimer of contracts, (vi) may prepare reports in conjunction with any interlocutory motions by the company or other stakeholders, and (vii) prepares a report on the plan of arrangement, which is usually included in the mailing of the plan, if one is filed.  Consent of the monitor is generally not required for the debtor to manage its business, including the sale of assets in the ordinary course, but the monitor may seek advice and directions of the court and/or ask that the court enjoin any actions that may prove harmful to the debtor and/or its creditors.  Though the monitor need not formally approve significant transactions such as asset sales outside of the ordinary course, court approval is generally required for such transactions and the court gives weight to the monitor's recommendations concerning such transactions.

9.    Upon commencement of a CCAA Proceeding, there is typically a stay of proceedings whereby all actions against the debtor and its assets are stayed, wherever located. The stay of proceedings is for a maximum initial period of thirty (30) days, but is typically extended where the debtor can show it continues to act with good faith and due diligence. There is no limit on the number or duration of these extensions of the stay.

10.    In the CCAA Proceeding, subject to limited exceptions, clauses triggering termination rights upon the debtor's commencement of an insolvency proceeding are not enforceable, so contract counterparties may not terminate contracts solely by virtue of the commencement of the CCAA Proceeding.

11.    Throughout a CCAA Proceeding, the court retains broad discretion to make any order that it considers appropriate in the circumstances.

<strong>OVERVIEW OF THE DEBTORS' BUSINESS[3]</strong>

**A.    <u>Corporate Structure</u>**

12.    Holdco is a private company incorporated under the Ontario *Business Corporations Act*, R.S.O. 1900, c. B. 16 (the "<u>OBCA</u>").  Holdco holds 100% of the shares of Primus Canada and PTUS.  Holdco's registered head office is located at 5343 Dundas Street West, Suite 400, Toronto, Ontario.

13.    Primus Canada is a private company incorporated under the OBCA. Primus Canada is the Primus Entities' Canadian operating company. Primus Canada's registered head office is located at 5343 Dundas Street West, Suite 400, Toronto, Ontario.

14.    PTUS is a subsidiary of Holdco and a private company incorporated under the laws of Delaware.  PTUS holds 100% of the shares of PTI and Lingo, and has no independent operations.  PTUS's registered head office is located at 2711 Centreville Road, Suite 400, Wilmington, New Castle County, Delaware.

15.    PTI is a subsidiary of PTUS and is also a private company incorporated under the laws of Delaware. PTI is in the business of selling telecommunications services primarily

---

[3] The information contained in Sections A, B, C, D, E and F under the heading "Overview of the Debtors' Business" is based upon discussion with management of the Primus Entities and review of the Nowlan Affidavit.  Some of the information is duplicative of information in the Verified Petition and the Nowlan affidavit, but is included for the convenience of the Court and the parties.

consisting of telephone and long distance voice services. PTI's registered head office is the same as PTUS.

16.     Lingo is also a private company incorporated under the laws of Delaware. Lingo offers VoIP telephone and long-distance voice services to both residential and small business customers. Lingo's registered head office is the same as PTUS.



**B.**    **The Business of the Primus Entities**

17. The Primus Entities re-sell a wide selection of residential and business telecommunications services (with the exception of wireless phone services). The revenue generated by Primus Canada accounts for approximately 88% of the Primus Entities' gross revenue. 78% of Primus Canada's revenue is generated in Ontario, with 10% in Quebec, 6% in British Columbia, 4% in Alberta, and 2% from other provinces. The U.S. Primus Entities generate the balance of the Primus Entities' gross revenue.

*Primus Canada*

18. The major carriers in Canada's telecommunications services industry are BCE Inc. ("Bell"), Rogers Communications Inc. ("Rogers"), Telus Corporation ("Telus"), MTS Inc./Allstream Inc. ("Allstream") and Shaw Communications Inc. ("Shaw" and together with Bell, Rogers, Telus and Allstream, the "Major Carriers").

19. The Major Carriers are Canada's five largest telecommunications service providers ("TSPs"). Combined, including their affiliates, they accounted for more than 84% of total market revenues in 2014. The next five largest TSPs accounted for 9% of total market revenues in 2014. Accordingly, the top 10 TSPs collectively capture 93% of industry revenues; the remaining TSPs capture the balance.

20. The top 10 TSPs are facilities-based service providers, meaning that they own and operate the majority of the transmission equipment required to provide their telecommunications services. The vast majority of the remaining TSPS are "re-sellers".

21. "Re-sellers" are TSPs who acquire (and require) wholesale services from other TSPs to provide telecommunications services to their own customers. Under a typical re-selling agreement, the wholesaler is responsible for physical service delivery and the re-seller manages

the customer relationship. As a result, the wholesalers own and operate the majority of the necessary infrastructure to provide telecommunications services but the consumers deal exclusively with the re-seller.

22.     The CRTC has mandated that the Major Carriers make certain services available to re-sellers. The Major Carriers sell these services to Primus Canada (and other re-sellers) at prices determined by the CRTC; all other services offered by Primus Canada are purchased at negotiated rates.

*Services*

23.     Primus Canada offers a wide selection of residential and business telecommunications services. Residential services include VoIP, residential internet services, traditional local phone, long distance phone, and pre-paid calling cards. Business services include H-PBX, local line, long distance, internet and data access services to small-to-medium-sized businesses. Primus Canada also provides wholesale long distance capacity and ancillary services to smaller telecommunications service providers. Primus Canada provides its services exclusively through re-selling, as described below.

24.     Primus Canada does not own sufficient telecommunications network infrastructure to service its customers without purchasing services from a Major Carrier.

25.     Primus Canada conducts its business through re-selling other TSPs' (primarily the Major Carrier) services purchased at wholesale rates determined by the CRTC, or through rates negotiated directly with the TSPs (the "Re-Sell Services"). The majority of Primus Canada's gross revenue is earned through the provision of Re-Sell Services.

26.     Certain elements of Primus Canada's services are supplied from 83 "co-locations" which it rents from Bell (74), Telus (5), and Allstream (4). The CRTC obligates the Major

Carriers to make space at certain of their facilities available for rent by secondary carriers at a fixed cost (a "co-location arrangement"). Prims Canada maintains hardware at such co-locations and these co-locations allows it to supply local phone, interest and VoIP services for higher margins.

27.     The CRTC regulates what services the Major Carriers must make available to secondary carriers at co-locations. Currently, the services provided by secondary carriers like Primus from co-locations are limited. For example, the higher margin internet offered by Primus Canada through its equipment located in the co-location sites is very restricted in the speeds offered and the geographic range of service covered due to several factors regulated by the CRTC which limit competitive access to the Major Carrier fiber network from the co-location sites to the end customer.

28.     Primus Canada is heavily dependent on the Major Carriers for both the Re-Sell Services business and the co-locations business. Primus Canada's largest Re-Sell Services vendors are Bell, Allstream, Rogers and Telus, accounting for approximately 50% of all supplier obligations to Primus Canada as of November 30, 2015. Bell is Primus Canada's single largest vendor.

29.     Primus Canada is also heavily dependent on its credit card processing service providers, including, without limitation, Chase Paymentech Solutions, Inc. ("Chase"). Approximately 30% of Primus Canada's customers pay for their services via credit card. Customer contract for services by the Primus Entities and arrange to pay for these services going forward by credit card. The credit card issuer extends credit to the cardholder by debiting the cardholder's credit card account. Upon being notified of the transaction, Chase pays the applicable Primus Entity and subsequently receives payment from the credit card issuer who

deals with payment from the credit card holder. There is a protocol in place for post-processing rejection and restitution, which is set out in the credit card processing agreement between the parties. Without Chase, Primus Canada is unable to process any credit card transactions.

30.    Primus Canada has approximately 204,000 residential customers and 23,000 commercial accounts. In 2015, approximately 56% of Primus Canada's revenue was generated from residential customers, and approximately 44% was generated from commercial customers.

### U.S. Primus Entities

31.    The U.S. Primus Entities account for 12% of the Primus Entities' gross revenue.

32.    The U.S. Primus Entities primarily offer digital home phone service via VoIP technology, which accounts for 39%, and long distance VoIP technology, which accounts for the balance of their revenue.

33.    The U.S. Primus Entities' largest supplier currently is PTGi International Carrier Services, Inc. ("PTGi-ICS"). PTGi-ICS is the wholesale supplier of long-distance phone service for resale by PTI; however, PTGi-ICS recently gave notice to terminate this agreement effective March 31, 2016.

34.    The U.S. Primus Entities have approximately 27,000 residential customers. Approximately 1,100 customers are located in Puerto Rico; the balance of the U.S. Primus Entities' customers are located throughout the United States.

35.    The Federal Communications Commission (the "FCC") regulates telecommunications policies in the United States. Given the small size of the U.S. Primus Entities' business, changes in FCC policy are not expected to materially impact the Primus Entities' overall performance.

36.    The U.S. Primus Entities are fully compliant with the American telecommunications licensing regime.

### *Integration between U.S. Primus Entities and Canadian Primus Entities*

37.    The Primus Entities' business is intertwined throughout the various Primus Entities' corporations the Primus Entities share networks, platforms, infrastructure and personnel, including senior management.

38.    More particularly, certain functions are completely integrated across all Primus Entities. The Primus Entities' executive management, located in Canada, is responsible for the strategic direction of the U.S. Primus Entities, and the Primus Entities' Human Resources department, also located in Canada, is responsible for such functions on an entity-wide basis.

### *Employees*

39.    As of December 9, 2015 the Primus Entities employed approximately 500 people in Canada and 28 in the United States. The Primus Entities' employees by location are summarized below:[4]

---

[4] In addition to the above, there are six employees in Canada and 20 in the United States who have made arrangements to work off-site.

| Location | Primus Entity | Employees |
|---|---|---|
| **Canada** | | |
| Toronto | Primus Canada | 242 |
| London | Primus Canada | 3 |
| Vancouver | Primus Canada | 11 |
| Markham | Primus Canada | 12 |
| Ottawa | Primus Canada | 81 |
| Edmundston | Primus Canada | 147 |
| **United States** | | |
| Cedar Rapids, IO | PTI | 4 |
| Tampa, FL | PTI | 4 |

40.    The Primus Entities' workforce is non-unionized.

41.    The Primus Entities do not have a pension plan for their employees.

### Offices and Facilities

*Canada*

42.    Primus Canada leases its head office in Toronto, Ontario.

43.    Primus Canada has two primary "switch sites"[5] located at 151 Front Street West, Toronto, Ontario, and 555 West Hastings Street, Vancouver, British Columbia.

44.    Primus Canada leases sales and support offices in London, Ontario and Vancouver, British Columbia.

45.    Primus Canada leases an office located in Markham, Ontario.

46.    Primus Canada leases two customer support centres located in Ottawa, Ontario and Edmundston, New Brunswick.

*United States*

---

[5] Network "hubs" – central facilities from which the Primus Entities' deliver services.

47.    PTI leases office space in Cedar Rapids, Iowa.  Four employees work out of that location and support the Primus Entities' Canadian and U.S. operations.

48.    PTI also leases and operates an office in Tampa, Florida.  Four employees work out of that location and their primary role is to provide customer support for the Puerto Rico customer base.

### Cash Management System

49.    In the ordinary course of their business, the Primus Entities use a centralized cash management system to, among other things, collect funds and pay expenses associated with their operations.  The Primus Entities maintain bank accounts in both Canada and the U.S. for their respective Canadian and U.S. operations as well as accounts related to the holding companies.

50.    In the ordinary course of their business, the Primus Entities use a centralized cash management system (the "Cash Management System") to, among other things, collect funds and pay expenses associated with their operations.

51.    As particularized in the Nowlan Affidavit, the Primus Entities maintain bank accounts in both Canada and the U.S. for their Canadian and U.S. operations as well as accounts related to the holding companies.

52.    In the United States, the Primus Entities maintain 11 bank accounts: one account with Banco Popular in Puerto Rico, one bank account with U.S. Bancorp ("US Bank"), and 9 bank accounts with Bank of America ("BOA").

53.    Continued access to the Cash Management System without disruption is critical to the ongoing business of the Applicants.

C.   **Assets**

54.   The Primus Entities prepare financial statements on a consolidated basis. As reflected in the unaudited consolidated financial statements of the Primus Entities for the eleven months' ended November 30, 2015, the assets of the Primus Entities had a net book value of approximately $145 million and consisted of the following:

| | | |
|---|---:|---:|
| Cash and equivalents | 2,896,794 | |
| Accounts receivable | 11,329,605 | |
| Prepaid expenses | 2,280,362 | |
| Inventory, deposits and other receivables | 1,649,540 | |
| **Total Current Assets** | **$18,156,301** | |
| Capital assets | | 26,958,328 |
| Goodwill and other intangibles | | 98,596,009 |
| Restricted cash | | 295,000 |
| Deferred charges | | 1,142,342 |
| | | 126,991,680 |
| **Total Assets** | | **$145,147,981** |

55.   Capital assets include network infrastructure equipment and associated installation costs; software and associated development costs; fiber optic network capacity that the Primus Entities own; capital costs associated with leasehold improvement work; equipment used for voice telecommunications services; infrastructure equipment for the US network; equipment provided to customers for rent; computers; office equipment and phone systems; and automobiles.

56.   The "Goodwill and other intangibles" line item represents intangible assets and consists of goodwill, brand and customer list intangibles, at 43%, 21% and 36% respectively.

57.   The principal debt obligations of the Primus Entities are described in more detail below.

## D.    **Current Liabilities**

58.    As of November 30, 2015, the Primus Entities had liabilities on a consolidated basis totalling $100,972,326.  The principal debt obligations of the Primus Entities are described in more detail below.

59.    In addition to the principal debt obligations as at November 30, 2015, the Primus Entities had approximately $30,386,172 of other current liabilities, including:

| | |
|---|---|
| Accounts payable | 7,887,868 |
| Accrued liabilities | 7,483,255 |
| Income taxes payable | (23,336) |
| Deferred revenue | 6,097,555 |
| Other current liabilities | 8,940,829 |
| **Total Current Liabilities[6]** | **$30,386,172** |

### *Credit Agreement*

60.    Primus Canada is indebted to the Bank of Montreal ("BMO"), HSBC Bank Canada ("HSBC") and ATB Corporate Financial Services ("ATB", and together with BMO and HSBC, the "Syndicate"),  in the amount of $40,700,000 pursuant to a Credit Agreement dated July 31, 2013, such credit agreement as amended by an amending agreement (the "Amending Agreement") dated September 23, 2014 (the "Credit Agreement").   The Credit Agreement matures on July 31, 2017.

### *Secured Debt*

61.    The Credit Agreement is comprised of two main credit facilities (the "Facilities"). Facility A is a secured revolving credit facility under which Primus Canada can draw up to

---

[6] Excluding secured debt.

$10,000,000 for general working capital purposes, subject to a borrowing base calculation. Facility B is a secured non-revolving credit facility under which the Syndicate made one advance to Primus Canada in the amount of $60,000,000. The Primus Entities also have a "swingline" facility under the Credit Agreement pursuant to which they have drawn a letter of credit in the approximate amount of $295,000 in relation to their tenancy at the customer support centre in Ottawa, Ontario

62.    Under the Credit Agreement, Primus Canada has granted comprehensive first-ranking security to BMO as administrative agent of the Syndicate over all of its assets pursuant to, among other things, a general security agreement.

63.    Primus Canada's obligations under the Credit Agreement are guaranteed by all of the Primus Entities. Such guarantees are also secured by substantially all of the assets of the Primus Entities pursuant to, among other things, general security agreements and a deed of hypothec, with (a) *Personal Property Security Act* ("PPSA") filing statements registered in the following jurisdictions:  Holdco (Ontario);  Primus Canada (British Columbia, Alberta, Saskatchewan, Manitoba, Ontario, New Brunswick and Quebec); and Lingo (Ontario); and (b) UCC registrations in the following jurisdictions:  Primus Canada (District of Columbia); PTUS (Delaware); Primus US (Delaware); and Lingo (Delaware).

64.    Counsel to the Monitor is in the process of completing a review of the security granted to the Syndicate and expects to be in a position to deliver an opinion on the validity and enforceability of such security shortly.  The Monitor will report on such security opinion in due course.

65.    In an event of default under the Credit Agreement, any credit issued under the Facilities becomes due and payable upon written notice to Primus Canada

66.    Primus Canada is also a counterparty to three swap agreements (together, the "Swap Agreements") with the Syndicate lenders HSBC, ATB and BMO (each being a "Swap Bank" and together, the "Swap Banks") in the approximate amount of $20,250,000. While each agreement is distinct, the terms of each are virtually identical. Under the Swap Agreements, Primus Canada has agreed to pay each Swap Bank a fixed rate of interest (1.97%) on a notional principal amount (which declines over time) on specific dates. Concurrently, each Swap Bank has agreed to make payments based on a floating interest rate to Primus Canada on that same notional principal on the same specified dates for the same specified time period. The Primus Entities' obligations under the Swap Agreements are secured by the general security agreement.

67.    If terminated as at January 14, 2016 under the Swap Agreement, the Swap Banks would be entitled to a payment in the approximate amount of $375,000 from Primus. The Swap Agreements expire July 31, 2017.

### Subordinate Credit Agreement

68.    Primus Canada is also indebted to the Manufacturers Life Insurance Company ("Manulife") and BMO Capital Partners ("BMOCP" and together with Manulife, the "Subordinate Lenders"), in the principal amount of $20,000,000 (the "Subordinate Debt") pursuant to a subordinate credit agreement (such credit agreement, as amended, the "Subordinate Credit Agreement") dated July 31, 2013, as amended by an amending agreement dated September 23, 2014.  The Subordinate Credit Agreement matures on July 31, 2018.  As of November 30, 2015, Primus Canada is indebted to the Subordinate Lenders in the amount of $22,971,359.94, inclusive of accrued interest.

69.    Under the Subordinate Credit Agreement, Manulife and BMOCP each established a credit facility for Primus Canada in the maximum principal amounts of $14,600,000 and

$5,400,000, respectively. Such funds were made available to Primus Canada by way of a single advance.

70.   Under the Subordinate Credit Agreement, Primus Canada has granted a security interest to Manulife as collateral agent of the Subordinate Lenders over all of its assets pursuant to, among other things, a general security agreement, which security interest ranks behind the security granted to the Syndicate pursuant to the terms of the Intercreditor Agreement (defined below).

71.   Primus Canada's obligations under the Subordinate Credit Agreement are guaranteed by all of the Primus Entities. Such guarantees are also secured by substantially all of the assets of the Primus Entities pursuant to, among other things, general security agreements and a deed of hypothec.  In an event of default, any credit issued under the Subordinate Credit Agreement becomes due and payable upon written notice to Primus Canada.

**E.      Financial Difficulties**

72.   The Primus Entities have been experiencing and continue to experience severe strains on their cash flow as a result of, among other things, declining revenues, the Primus Entities' customer base transitioning to lower profit margin services and over-leverage.  The Primus Entities' significant fixed costs have hindered their ability to quickly and adequately respond to such revenue declines.

73.   As a result, the Primus Entities' earnings before interest, taxes, depreciation and amortization ("EBITDA") and net operating profit have deteriorated over the last three years, and continue to deteriorate. While EBITDA has stabilized over the last seven months due to cost management and reduced marketing activities, this level of EBITDA is insufficient to meet the obligations under the secured credit agreements.

*Revenue*

74.     Since 2012, the Primus Entities' revenue has declined an average of 9% per year. The Primus Entities' Canadian residential business, representing approximately 56% of their gross revenue for 2015, has declined an average of 9% year-over-year ("YOY") since 2012.

75.     Changing technology and, as a result, consumer behaviour is the primary driver behind the residential sector revenue decline. Advances in network and wireless technology have decreased demand for long-distance and local phone, and pre-paid calling cards (the "Legacy Services"). In addition, rapid growth in the sale of bundled TV, internet, and voice services by the Major Carriers have exerted considerable price pressures on the markets that the Primus Entities compete in.

76.     Consumer preferences are shifting towards mobile technology and high-speed internet. The Primus Entities do not have the capability to provide mobile services. The Primus Entities' internet services offered through their co-location sites are primarily limited to lower-speed offerings. As such, the Primus Entities' internet service customers have been rapidly transitioning from higher margin co-location services to materially lower margin re-sell services.

77.     The Primus Entities' residential service offering primarily involves the provision of Legacy Services, with high-speed internet services representing a growth offering. In the past, Legacy Services were the Primus Entities' largest revenue generator. Since 2012, however, the Primus Entities' revenue from Legacy Services in Canada has declined 18% YOY and 25% YOY in the United States.

78.     Moreover, in 2013, Bell accelerated the promotion of its bundled high-speed internet, TV, and voice service offerings (the "Triple Play" bundle) leading to considerable pricing pressures on the market for such services. The Primus Entities do not offer TV services,

and thus cannot create a bundle offering to compete against the bundled offerings of the Major Carriers.

79.     The attraction of new customers in 2014 and Q1 of 2015 has also contributed to the Primus Entities' profitability decline. Each new customer represents additional marketing, hardware and installation costs, as well as staffing costs related to the on-boarding of those customers.

80.     It can take up to a year before the costs associated with a new customer are recovered. Therefore, adding new customers to offset the rapidly declining Legacy Services revenues requires significant capital. Due to limits imposed by its capital structure, a lack of new capital availability, and the decline of high profit margin Legacy Services and co-location services revenues, the Primus Entities have had to constrain their customer growth initiatives.

81.     As a result of the decline in demand for Legacy Services, the Primus Entities' inability to offer mobile services and their inability to compete with Bell's Triple Play bundle (or similar bundles offered by the other Major Carriers), the Primus Entities' gross revenue decreased from $229,024,000 in the fiscal year ended 2012 ("FY2012") to $198,511,000 in the fiscal year ended 2013 ("FY2013") and to $180,078,000 in the fiscal year ended 2014 ("FY2014") and is forecasted to decline to $165,859,252 in the fiscal year ended 2015 ("FY2015").

*Expenditures*

82.     The Primus Entities have high fixed overhead costs, which cannot be materially reduced as they relate to functions that are necessary to run the Primus Entities' business. Such costs stem from supporting a national telecommunications infrastructure with the related

engineering and support requirements. Moreover, as the Primus Entities' customer base has been steadily declining, any reductions in overhead costs are outweighed by declining revenue.

83.    In order to maintain and grow their service offerings, the Primus Entities incur capital expenditures ("Capex") every year. Such Capex include (i) hardware related to the sales of H-PBX and VoIP; (ii) network and client premises equipment expenditures required to support new customers; (iii) maintenance and replacement of components in network infrastructure; (iv) investment in network and internet delivery infrastructure; (v) capitalized employee and consulting costs associated with network projects; and (vi) maintenance and improvements to the Primus Entities' information systems, software, servers and storage capacity.

84.    Over the past four years, the Primus Entities' annual average Capex was $7,898,993 per year.

85.    The Primus Entities are also carrying significant debt service obligations in respect of their secured debt facilities

86.    In 2015, the Primus Entities' debt service obligations and capital expenditures totalled approximately $18,365,182[7] compared to $9,871,722 in EBITDA.

***EBITDA***

87.    As a result of the declining Legacy Services revenues, the margin pressures exerted by the Primus Entities' changing revenue mix, and the high up-front costs associated with adding new customers, the Primus Entities' EBITDA declined from $41,442,000 in FY2012 to $36,073,000 in FY2014 and $22,499,000 in FY2014, and $9,871,722 forecasted in FY2015.

---

[7] Debt service obligations ($12,295,438); capital expenditures ($6,069,744).

88.    This annual downward trend has continued in the current fiscal year as a high volume of new customers were added in the fourth fiscal quarter of 2014 and the first fiscal quarter of 2015. For the first quarter of 2015, EBITDA has declined 89% over the same period in the prior year, from $7,123,000 to $753,000. Monthly EBITDA has stabilized at approximately $1 million per month for the last 9 months of 2015. The stabilized EBITDA is due to the reduction in marketing initiatives resulting in lower volume of new customer sign-ups, and overall cost reduction initiatives.

*Net Income/Loss*

89.    The Primus Entities reported a net loss of $830,000 in FY 2014, and a forecast a net loss of $13,078,000 for FY2015.

90.    A copy of the Primus Entities' consolidated unaudited financial statements for the eleven months ending November 30, 2015, is attached to the Nowlan Affidavit as **Exhibit B**.

91.    A copy of the Primus Entities' consolidated financial statements, prepared on a 13-month rolling basis and current to November 30, 2015 is attached to the Nowlan Affidavit as **Exhibit C**.

92.    The Primus Entities have not finalized their FY2015 audited financial statements.

***Defaults Under the Credit Agreements***

*Credit Agreement*

93.    Under the Credit Agreement, Primus Canada is required to, among other things, maintain certain debt to EBITDA ratios. Under Facility B specifically, Primus Canada is required to, among other things, make quarterly principal repayments in the amount of $2,250,000 on the last business day of each calendar quarter. Failure to meet these covenants constitutes an event of default.

94.    As of late 2014, the Primus Entities have been unable to maintain certain debt to EBITDA ratios specified under the Credit Agreement (the "Credit Agreement Defaults"), and were therefore in default under the Credit Agreement.

95.    The Credit Agreement Defaults have placed the Syndicate in a position to declare a "Standstill Period" pursuant to the Intercreditor Agreement.  During a Standstill Period, Primus Canada would be prohibited from making any payments due under the Subordinate Credit Agreement, other than reasonable expenses due not in excess of $100,000.

96.    Primus Canada entered into a forbearance agreement with the Syndicate on February 4, 2015 (the "Syndicate Forbearance Agreement").  Under the Syndicate Forbearance Agreement, Primus Canada acknowledged the Credit Agreement Defaults and agreed to provide a revised business plan for fiscal year 2015 and specified financial information.  A copy of the Syndicate Forbearance Agreement is attached as **Exhibit D** to the Nowlan Affidavit.

97.    The Syndicate Forbearance Agreement expired on February 27, 2015.

98.    On February 27, 2015, the Syndicate gave notice to Primus Canada that (i) the Syndicate reserved its rights to take the steps it believes are required to, among other things, realize on its security; (ii) the Syndicate was exercising its right to charge an additional 2% per annum interest on all amounts outstanding under the Credit Agreement; and (iii) Duff & Phelps Canada Restructuring Inc. was to be appointed pursuant to the Credit Agreement as a consultant to review and report the viability of the Primus Entities' business and strategy going forward on behalf of the Syndicate.

99.    As described in greater detail below, on August 31, 2015, following extensive and careful arms-length negotiation commencing in July 2015, Primus Canada entered into a support

agreement with the Syndicate lenders (the "Support Agreement") further to which the Syndicate agreed to support a sale and investor solicitation process (a "SISP") on a going concern basis.

*Subordinate Credit Agreement*

100.    Primus Canada has also defaulted under the Subordinate Credit Agreement. Specifically, Primus Canada has not serviced its Subordinate Debt since January 31, 2015, which constitutes a default under section 9.01(b) of the Subordinate Credit Agreement and a cross-default under section 9.01(f) of the Credit Agreement. Primus Canada also did not maintain certain debt to EBITDA ratios specified under section 6.03 of the Subordinate Credit Agreement (together with the section 9.01 defaults, the "Subordinate Credit Agreement Defaults").

101.    Primus Canada entered into a forbearance agreement with the Subordinate Lenders on February 4, 2015 (the "Subdebt Forbearance Agreement"). Under the Subdebt Forbearance Agreement, Primus Canada acknowledged the Subordinate Credit Agreement Defaults and agreed to provide a revised business plan for fiscal year 2015 and specified financial information. Primus Canada further agreed that as a consequence of the Subordinate Credit Agreement Defaults the Subordinate Lenders were entitled to charge an additional 2% interest in accordance with section 9.02 of the Subordinate Credit Agreement, upon written notice of same. A copy of the Subdebt Forbearance Agreement is attached as **Exhibit E** to the Nowlan Affidavit.

102.    The Subdebt Forbearance Agreement expired on March 2, 2015. On March 9, 2015, the Subordinate Lenders gave notice to Primus Canada that (i) due to the Subordinate Credit Agreement Defaults, interest on all amounts outstanding under the Subordinate Credit Agreement were accruing interest at a rate of 15% per annum, as of January 31, 2015, in accordance with section 3.06 of the Subordinate Credit Agreement; and that (ii) the Subordinate

Lenders have reserved their rights to take the steps they believe are required to, among other things, realize on their security.

### Support Agreement and the SISP

103.    As mentioned above, on August 31, 2015, following extensive and careful arms-length negotiations, Primus Canada entered into a support agreement with the Syndicate lenders (the "Support Agreement") further to which the Primus Entities agreed to conduct and the Syndicate agreed to support a sale and investor solicitation process (a "SISP") on a going concern basis. A copy of the Support Agreement is attached as **Exhibit F** to the Nowlan Affidavit.

### The Support Agreement

104.    The Primus Entities elected to pursue the SISP outside of CCAA proceedings out of concern that, among other things, a prolonged period under CCAA protection necessary to implement a post-CCAA filing sales process would have a serious and detrimental impact on the Primus Entities' business and its customers which could diminish the value of the business as a whole. The bargain reflected in the Support Agreement was a product of a meticulous balancing of interests of Primus Entities' various stakeholders, the result of which was to allow the Primus Entities to implement its proposed restructuring strategy (i.e., the SISP) as a going concern while preserving the position of the Syndicate Lenders and the Primus Entities' other stakeholders if the SISP did not, ultimately, result in any restructuring transaction(s).

105.    Under the Support Agreement, the Syndicate lenders agreed among other things, to:

      (a)     a standard forbearance in exercising their rights and remedies as creditors;

      (b)     a series of particular covenants to support the implementation and execution of the SISP, including not to take any action inconsistent with

the Support Agreement or that would frustrate the consummation of any SISP transaction(s);

(c)     support the approval of any SISP transaction(s) as promptly as practicable if the transaction is acceptable to the Syndicate lenders and BMO, in its capacity as administrative agent to the Syndicate, acting reasonably; and

(d)     not to propose, vote for or otherwise support alternative arrangements under the CCAA, the *Bankruptcy and Insolvency Act*, R.S.C. 1985, c. B-3 or otherwise (thereby circumventing the SISP at a sensitive time).

106.     In exchange, Primus Canada agreed, among other things:

(a)     to certain reporting and monitoring requirements, particularly with regard to the progress of the SISP;

(b)     not to materially increase compensation, severance or other benefits payable to their employees except in accordance with the terms of the key employee retention plan ("KERP") in the form attached to the Support Agreement[8];

(c)     to adhere to an ongoing business plan, with reference to a particular cash flow projection and with detailed reporting obligations; and

(d)     to implement the SISP for the purpose of identifying one or more purchasers of and/or investors in the Primus Entities' business with a targeted completion date for a transaction of December 31, 2015.

107.     All material decisions with respect to the SISP (including whether to enter into a transaction and which one to enter into) remained exclusively within the sole discretion of the boards of the Primus Entities (and concomitantly their current management) to be made in accordance with their fiduciary duties with respect to securing the best available strategic alternative for the Primus Entities.

108.     The timeline for implementing the SISP was set out in section 5 of the Support Agreement (each step being designated a "Milestone", the execution of which was an essential

---

[8] The Primus Entities have entered into KERPs with 8 people, each of whom are critical to the strategic, day-to-day operations and management of the Primus Entities and/or the smooth execution and implementation of the SISP. The KERPs provide for future potential payments to the KERP participants in the maximum aggregate amount of $500,000.

precondition to the continuance of the Support Agreement).  Pursuant to the Support Agreement,

Primus Canada covenanted to:

    a.    Commence marketing to prospective financiers, investors and/or purchasers (together, with others expressing a similar interest, the potential "Interested Parties") on or before September 1, 2015;

    b.    Be in receipt of one or more Phase I Bids (which is defined as an original executed copy of a comprehensive non-binding letter of intent) on or before October 1, 2015;

    c.    Be in receipt of one or more Phase II Bids (which is defined as a comprehensive, final and binding proposal) on or before November 2, 2015;

    d.    Enter into a binding agreement(s) with the "Successful Bidder(s)" (a bidder whose Phase I Bid was, ultimately, accepted and with whom the Primus Entities seeks to consummate a transaction) on or before November 30, 2015; and

    e.    Close all agreements and transactions with the Successful Bidder(s) On or before December 31, 2015.

109.    The failure to meet any of the Milestones set out above was a "Triggering Event" within the meaning of section 8 of the Support Agreement, which entitled any Syndicate lender to terminate the Support Agreement.  As a result, continued and ongoing adherence to the Milestones was a necessary precondition for successfully implementing the SISP (and thereby facilitating a successful restructuring).

110.    However, it was also understood that the Milestones and procedures could be amended at any time by mutual agreement should there be sufficient rationale that such amendments would be to the mutual benefit of the parties to the Support Agreement and other stakeholders of the Primus Entities.

111.    On October 30, 2015, Primus Canada and the Syndicate lenders entered into an agreement (the "First Amending Agreement") extending the SISP timeline originally provided

for in the Support Agreement to allow Primus Canada to be in receipt of one or more Phase II Bids on or before November 16, 2015 and to enter into a binding agreement(s) with the Successful Bidder(s) on or before December 14, 2015. The First Amending Agreement is attached as **Exhibit G** to the Nowlan Affidavit.

112.    The Milestones in the Support Agreement were extended in accordance with its terms, in part, to provide potential SISP bidders with further time to complete all required due diligence and otherwise to ensure their bids could be turned into executable transactions in compliance with the SISP.

113.    The SISP timeline was further extended pursuant to a second agreement (the "Second Amending Agreement"), which allowed the Primus Entities: (i) to be in receipt of one or more Phase II bids on or before December 23, 2015; (ii) enter into a binding agreement with the Successful Bidder(s) on or before January 19, 2015; and (iii) close all agreements and transactions on or before February 29, 2016.

*The SISP*

114.    Further to the timeline and conditions set out in the Support Agreement (and as will be described in greater detail in the Primus Entities' materials to be filed in support of a motion (the "Sale Approval Motion") to approve, *inter alia*, a sale of the Primus Entities' assets (if this Court grants the Initial Order sought herein)), the Primus Entities commenced the SISP in September 2015.

115.    Following a competitive selection process, Origin Merchant Partners ("Origin") was engaged by Primus Canada to act as a financial advisor pursuant to an engagement letter dated August 7, 2015 (the "Engagement Letter") and commenced solicitation of potentially interested parties.

116.    As a result of the efforts of the Primus Entities, Origin and other advisors, six interested parties emerged and submitted Phase I Bids. Three parties ultimately submitted comprehensive, final and binding offers.

117.    A period of extensive and intensive arm's length negotiations followed the receipt of offers, each of which were evaluated in accordance with the criteria enumerated in the SISP. Ultimately, the bid by Birch Communications Inc. ("Birch Communications") was determined to be the Successful Bid.

118.    An essential precondition to the contemplated Asset Purchase Agreement ("APA") between the Primus Entities and Birch Communications (in this capacity, the "Purchaser") was the expeditious application to this Court for the Initial Order sought herein.

119.    In advance of filing for CCAA protection, and in order to comply with the provisions of the Support Agreement detailed above, the parties entered into two preliminary agreements:

      a.     First, on December 18, 2015, the Primus Entities entered into an Escrow Agreement with the Purchaser and FTI (as escrow agent), whereby $2,000,000 would be deposited into an escrow account in contemplation of entering into the aforementioned APA to be released as part of the closing thereof; and

      b.     Second, on December 22, 2015, the Primus Entities entered into an exclusivity letter agreement with the Purchaser whereby the Primus Entities agreed to terminate any existing discussions with any third party, and not to solicit, encourage or otherwise commence or continue discussions with, or provide any information to, any third party, regarding the sale to any such third party of all or any of the Purchased Assets (as defined in the APA) or any investment or other participation by any such third party in any of the business, enterprise, securities, assets or properties of any of the Primus Entities. The exclusivity letter agreement was a condition precedent to the Purchaser pursuing the sale transaction contemplated in the APA.

120.    After extensive deliberations and consultations with their professional advisors, the Primus Entities concluded, further to and on the basis of their commercial and business judgement, that the transaction contemplated in the APA represented the best offer available to them in the circumstances and that proceeding with such transaction was in the best interest of stakeholders.

### *The Sale Transaction*

121.    The Primus Entities and the Purchaser executed and delivered a definitive version of the APA dated January 18, 2016, subject to Court approval. Further details and a copy of the APA will be served and filed with the Primus Entities' motion materials to approve same.

122.    The essential terms of the definitive version of the APA and the Sale Transaction contemplated therein are as follows:

a.    The Purchaser will acquire substantially all of the business, assets and operations of the Primus Entities, including principally all of their patents, patent applications, trademarks and domains ("Purchased Assets" and "Purchased Intellectual Property" respectively, and as set out in Schedule "A" and "H" to the APA) but excluding any shares and other securities owned by any Primus Entity ("Excluded Assets", set out in Schedule "D" to the APA) on an "as is, where as" basis as existing at "Closing Time" (as defined in the APA and subject to representation and warranties therein);

b.    The aggregate purchase price ("Purchase Price") payable to the Primus Entities is calculated on the basis of the Purchase Price formula set out further to sections 3.1 and 3.7 of the APA, consisting of the following:

i.    The "Base Purchase Price" of $44 million (as the term is defined in the APA and as adjusted in accordance with the formula set out therein);

ii.    Less certain Cure Costs (as defined in the APA); and

iii.    Less certain other amounts payable that do not constitute Cure Costs in respect of "Essential Contracts" (as defined in the APA).

c.    The Purchaser may, in its sole discretion, offer employment to any or all active and inactive Primus Entity employees (collectively "Transferred Employees") conditional on "Closing" (as each is defined in the APA);

    d.      The Purchaser will assume, perform, discharge and pay the obligations of the Primus Entities ("Assumed Obligations") set out in section 2.5 of the APA, including, but not limited to, the following:

        i.      all debts, liabilities and obligations under an "Assumed Contract" assigned or transferred to the Purchaser on Closing for the period from and after Closing Time, provided that such debts, obligations or liabilities do not arise from or are due or attributable to:

            1.   any default existing or breach by any Primus Entity occurring prior to or as a consequence of Closing, or

            2.   any default, breach or violation of any Primus Entities' of any term or condition of the APA;

        ii.     all debts, liabilities and obligations for which the Purchaser is responsible in respect of Transferred Employees as per the APA.

123.    The Purchaser may terminate the APA, in its sole and absolute discretion, if this Court orders a post-filing sales process or it may elect not to terminate the APA and have it serve as a the stalking horse offer in such post-filing sales process with customary stalking horse protections, in accordance with the terms of the exclusivity letter arrangement (which are to include, without limitation, a 3% break-free to be paid from the proceeds of any overbid in favour of the Purchaser), subject to court approval.

124.    Subject to obtaining the Initial Order being sought herein, the Primus Entities intend to return to this Court to seek approval of the APA and various ancillary relief, including, if necessary, the assignment of certain agreements to the extent that necessary consents to such assignments are not obtained prior to the date of the motion.

## F.    The Canadian Proceeding

125.    Defaults under the Credit Agreement or the Subordinate Credit Agreement allow the Syndicate or Subordinate Lenders, respectively, to exercise certain remedies, including acceleration of payment of all amounts due under their agreement. Primus Canada does not have

sufficient liquidity to satisfy the accelerated payment obligations arising from an event of default under either agreement.

126.    The Syndicate lenders require the Primus Entities to proceed expeditiously with obtaining approval and implement the APA and have indicated that they will not extend the forbearance under the Support Agreement otherwise.

127.    Without forbearance, the Primus Entities cannot meet their liabilities as they come due and do not have sufficient cash to service their debt obligations.  As such, the Primus Entities are insolvent.  Therefore, the Primus Entities required CCAA protection to implement sales of their assets for the benefit of their stakeholders.

128.    On January 18, 2016 the boards of the Debtors authorized the CCAA filing.

129.    On January 19, 2016, an Order was entered in the Canadian Proceeding appointing FTI as Monitor and authorized Foreign Representative for the Debtors.  As indicated above, a certified copy of the Order appointing the Foreign Representative (the "Initial CCAA Order") is attached hereto as **Exhibit A**.

130.    The Initial CCAA Order specifically contemplates the institution of these chapter 15 proceedings by the Foreign Representative.

131.    At this time, however, the Foreign Representative is only seeking recognition of the Initial CCAA Order under chapter 15 of the Bankruptcy Code.

132.    Subject to obtaining the recognition being sought herein, the Debtors intend to return to the Canadian Court to seek approval of the APA and vesting of all of the Purchased Assets in the Purchaser (as defined in the APA), free and clear, (the "Canadian Approval & Vesting Order") and various ancillary relief, including, if necessary, the assignment of certain

agreements to that necessary consents to such assignments are not obtained prior to the date of the motion.

133.    Subject to obtaining the Canadian Approval & Vesting Order in accordance with the requirements of Canadian Law, the Debtors intend to return to this Court to seek recognition of the Canadian Approval & Vesting Order in accordance with the requirements of chapter 15 of the Bankruptcy Code.

## NEED FOR PROVISIONAL RELIEF

134.    Recognition of the Canadian Proceeding under chapter 15 of title 11 of the United States Code (the "Bankruptcy Code"), and provisional relief pending a final recognition hearing will best assure an economical and equitable administration of the Debtors' foreign estate. Immediate relief is sought in order to preserve and protect the Debtors' assets and prevent harm to the Debtors' creditors while preventing the Debtors from running afoul of any United States Courts. If injunctive relief is not granted, the Debtors' creditors are likely to take actions that would disrupt the orderly administration of the Debtors' estate, leading to conflict between the United States and the Canadian Court and, at a minimum, overly burden the sale process. Moreover, if the provisional relief is not granted, the Debtors are exposed to an imminent risk that suppliers will terminate supply agreements that may put the going concern sale in jeopardy. Also, the relief is necessary as there is a material risk that parties in the United States will take steps that will cause harm to the Debtors' ability to complete a sale of the Primus Entities' business and assets for the benefit of all of the Debtors' creditors. The chapter 15 proceedings are intended to stabilize the business and prevent termination of agreements in order for me to perform my court-appointed duties to complete the contemplated sale transaction.

135.    Granting the relief sought herein will best assure an economical, expeditious and

equitable administration of the Debtors' estate. Moreover, rather than exposing the Debtors and its assets to litigation that could lead to piecemeal distribution of its assets, as well as additional costs and distraction from the administration of the estate, the Debtors will be afforded the "breathing room" to conduct an orderly sale of the Primus Entities' business.

136.    As set forth in the Petition for Recognition, the Primus Entities are the subject of a "foreign proceeding" within the meaning of Section 101(23), which is a "foreign main proceeding" within the meaning of section 1502(4) of the Bankruptcy Code. Further, the Petitioner is a "foreign representative" within the meaning of Section 101(24) of the Bankruptcy Code.

137.    The Debtors are entitled to obtain the provisional relief requested pursuant to Sections 105(a) and 1519 of the Bankruptcy Code. Pursuant to Sections 105(a) and 1519, injunctive relief in the form requested is in the best interest of the Debtors and their creditors and may be issued on a temporary basis without notice.

138.    In contrast to the potential harm described above, granting the relief requested will not prejudice any persons subject to the injunctive relief. It is important to note that the Foreign Representative is only seeking to ensure that parties are enjoined from circumventing the Canadian Proceeding and from taking actions in the United States that could prove wasteful of the time and effort of United States courts as well as all interested parties.

## REQUESTS FOR RECOGNITION AND RELATED RELIEF[9]

139.    In connection with the filing of these chapter 15 cases, the Debtors have submitted the Petition for Recognition, the Emergency Motion for Temporary Restraining Order, and After Notice and Hearing, a Preliminary Injunction, Pursuant to Bankruptcy Code Sections

---

[9] Capitalized terms used but not otherwise defined in this section have the meanings ascribed to them in the relevant First Day Papers.

105(a), 362, 1507, 1519, and 1521 (the "Provisional Relief Motion"), the Motion of Foreign Representative Requesting Joint Administration of the Debtors' chapter 15 Cases for Procedural Purposes Only (the "Joint Administration Motion"), and the Motion for Order Scheduling Hearing on Verified Petition Under chapter 15 for Recognition of Foreign Main Proceeding and for Additional Relief and Assistance Under Bankruptcy Code Sections 105(a), 1507, and 1521, and Specifying Form and Manner of Service of Notice of Hearing (the "Notice Procedures Motion"). In addition to the facts set forth above, factual bases for relief under each of these motions is set forth below. I believe, after consultation with counsel, that the relief requested by each of the motions is necessary to protect the Debtors' assets, maximize value for all of the Debtors' creditors and properly administer these proceedings.

A.      *Petition for Recognition and Provisional Relief Motions*

140.    Concurrently herewith, the Foreign Representative filed the Petition for Recognition Motion and the Provisional Relief Motion seeking (a) entry of the Provisional Order: (i) recognizing the Initial CCAA Order and the Canadian stay of proceedings, (ii) applying section 362 of the Bankruptcy Code in these chapter 15 cases on an interim basis pursuant to sections 1519(a)(3), 1521(a)(7), and 105(a) of the Bankruptcy Code, and (iii) granting such other and further relief as the Court deems just and proper; and (b) entry of the Final Order: (i) granting the petitions in these cases and recognizing the Canadian Proceeding as a foreign main proceeding pursuant to section 1517 of the Bankruptcy Code, (ii) giving full force and effect in the United States to the Initial CCAA Order, including any extensions or amendments thereof authorized by the Canadian Court and extending the protections of the Provisional Order to the Debtors on a final basis, and (iii) granting such other and further relief as the Court deems just and proper.

141.    As detailed more fully in the Petition for Recognition Motion and based upon my understanding of the facts set out above, I believe that there is a compelling case for recognition of the Canadian Proceeding as a foreign main proceeding. I have been advised by counsel that the Canadian Proceeding is a "foreign proceeding" and that the Foreign Representative is a "foreign representative," as those terms are defined in the Bankruptcy Code. I have been further been advised that these cases were duly and properly commenced by filing the Petitions for Recognition accompanied by all fees, documents, and information required by the Bankruptcy Code and the Bankruptcy Rules.

142.    Counsel for the Foreign Representative has also advised me that the stay of proceedings is one of the most fundamental protections provided by the Bankruptcy Code. I have been advised that it halts all collection efforts, harassment, and foreclosure actions against debtors and provides them with necessary breathing room to step back from and attempt to resolve the financial pressures that caused their bankruptcy filing. Here, the immediate imposition of the automatic stay pursuant to the Provisional Order is necessary given that, among other things, the Debtors are exposed to an imminent risk that counter-parties, including vendors will seek to terminate agreements, which would jeopardize the potential going concern sale in the Canadian Proceeding.

143.    In contrast, I believe that the Debtors' creditors will suffer little, if any, harm as a result of the requested provisional relief as such relief will merely preserve the *status quo* and enable the Debtors to continue to orderly carry out their operations during the short time necessary for the Court to rule on the Petitions for Recognition. As set out above, I believe that granting the request for provisional relief will benefit the Debtors' creditors because it will ensure that the value of the Debtors' assets and business are preserved and maximized.

144.    I can attest that the Canadian Proceeding is pending in Canada and Canada is the center of each of the Company's main interests.    As set forth above, the Debtors are headquartered in Toronto, Ontario, Canada, with offices located across Canada. The Debtors share networks, platforms, infrastructure and personnel, including senior management.    A significant majority of the Primus Entities' revenue comes from its Canadian operation and the overwhelming majority of their customers reside in Canada as set out above and particularized in more detail in the Nowlan Affidavit.

145.    Finally, as described in the Petition for Recognition Motion, and as discussed with counsel, I understand and believe that recognizing the Canadian Proceeding as a foreign main proceeding and granting the relief requested therein on a final basis is consistent with the purposes of chapter 15 of the Bankruptcy Code and public policy of the United States.

146.    Therefore, I believe that the provisional and final relief requested in the Petition for Recognition and Provisional Relief Motions is necessary and appropriate and is in the best interests of the Debtors, their creditors, and other parties in interest.

**B.**    ***Joint Administration Motion***

147.    The Foreign Representative has also filed, concurrently herewith, the Joint Administration Motion seeking entry of an order directing joint administration of these chapter 15 cases for procedural purposes only, and providing that parties in interest shall use a consolidated caption to indicate that any pleading filed relates to the jointly administered chapter 15 cases.

148.    I believe that joint administration of these chapter 15 cases is warranted because the Debtors' financial affairs and business operations are closely related and because it will ease the administrative burden of these cases on the Court and interested parties.    I can confirm that

the Foreign Representative anticipates that the various notices, motions, hearings, orders, and other pleadings in these cases will affect all of the Debtors. I believe that the failure to jointly administer these cases would result in numerous duplicative pleadings filed for each issue and served upon separate service lists. I also believe that such duplication of substantially identical documents would be wasteful and would unnecessarily burden the Clerk of the Court (the "Clerk").

149.   Moreover, I have been advised that joint administration will permit the Clerk to use a single docket for all of the Debtors' cases and to combine notices to creditors and other parties in interest. As of the date hereof, the Monitor has established a case website with the following URL 'http://cfcanada.fticonsulting.com/primus' (the "Case Website"). I have further been advised that joint administration will protect parties in interest by ensuring that they will be apprised of the various matters before the Court, including, by reference to the Case Website. I believe that the proposed caption set forth in the Joint Administration Motion should be approved as the modified caption for these chapter 15 cases.

150.   I believe that the rights of the respective creditors of each of the Debtors will not be adversely affected by joint administration of these cases in as much as the relief sought in the Joint Administration Motion is purely procedural and not intended to affect substantive rights. I have been advised that each creditor and party in interest will maintain whatever rights it has against the particular Debtor against which it allegedly has a claim or right. I have also been told by my counsel that the rights of all creditors will be enhanced by the reduction in costs resulting from joint administration. Finally, I have been advised that if the requested relief is granted, the Court and the Clerk will be relieved of the burden of entering duplicative orders and keeping duplicative files, and supervision of the administrative aspects of these cases by the Office of the

37

United States Trustee for the District of Delaware will be simplified.

151.    Therefore, I believe that the relief requested in the Joint Administration Motion is necessary and appropriate and is in the best interests of the Court, the Debtors, their creditors, and other parties in interest.

**_Notice Procedures Motion_**

152.    Concurrently herewith, the Foreign Representative has also filed the Notice Procedures Motion seeking the entry of an order approving (a) the form of notice (the "Recognition Hearing Notice") of (i) the chapter 15 petitions, (ii) the entry of the Provisional Order, (iii) the deadline to object to the proposed Final Order, and (iii) the Recognition Hearing and the manner of service of the Recognition Hearing Notice.

153.    I can attest that the Debtors have hundreds of potential creditors and other parties in interest, all of whom need to be provided with, among other things, notice of the Provisional Order, the proposed Final Order, the Recognition Objection Deadline, and the Recognition Hearing.  Under the facts and circumstances of the Debtors' chapter 15 cases, I submit that service of the Recognition Hearing Notice in the manner set out in the Recognition Hearing Notice will provide the Notice Parties with due and sufficient notice of the relief requested in the Recognition and Relief Motion and associated objection deadline and hearing dates.

154.    Furthermore, I believe that the Recognition Hearing Notice provides multiple efficient ways for any party receiving such notice to obtain copies of pleadings filed in these chapter 15 cases, as it provides a link to the Case Website as well as contact information that can be used to obtain critical documents including the Recognition Motion, the Provisional Order, the Trustee Order, and the proposed Final Order.  Additionally, I believe that service by the

Foreign Representative of notices of the availability of each pleading that it files in these cases on the Case Website, by United States or Canadian mail, first class postage prepaid, on the Master Service List is an efficient and effective way to provide notice to such key parties in these cases and the Canadian Proceeding. At the same time, I believe that it will not overburden the Foreign Representative with the significant costs associated with copying and mailing all the various documents filed in these cases to the entire matrix of putative creditors and other parties.

155.    Therefore, I believe that the relief requested in the Notice Procedures Motion is necessary and appropriate and is in the best interests of the Court, the Debtors, their creditors, and other parties in interest.

## NO PRIOR REQUEST

156.    No prior application for any of the above relief has been made.

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]*

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed at Toronto, Ontario on January 19, 2016.

_____
**Nigel D. Meakin**
**Senior Managing Director**
**FTI Consulting Canada Inc.**, in its capacity as
authorized Foreign Representative of **PT Holdco,
Inc., Primus Telecommunications Canada, Inc.,
PTUS, Inc., Primus Telecommunications, Inc.,
and Lingo, Inc.**