**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 15 |
| | ) | |
| PT HOLDCO, INC., *et al.*,[1] | ) | Case No. 16-10131 (LSS) |
| | ) | |
| Debtors in a Foreign Proceeding. | ) | (Jointly Administered) |
| | ) | |

**FOREIGN REPRESENTATIVE'S MOTION, PURSUANT TO SECTIONS 363, 365, 1501,**
**1517, 1519, 1520, 1521 AND 105(a) OF THE BANKRUPTCY CODE AND BANKRUPTCY**
**RULES 2002, 6004 AND 9014, FOR ENTRY OF AN ORDER RECOGNIZING AND**
**ENFORCING THE ASSIGNMENT, VESTING AND DISTRIBUTION**
**ORDERS AND GRANTING RELATED RELIEF**

FTI Consulting Canada Inc. ("Foreign Representative" or the "Monitor") is the court-

appointed monitor and duly authorized foreign representative for PT Holdco, Inc., PTUS, Inc.

Primus Telecommunications, Inc., Lingo, Inc., and Primus Telecommunications Canada Inc.

("Primus Canada" and, collectively, the "Debtors") in Canadian insolvency proceedings with

Court File No. CV-16-11257-00CL (the "Canadian Proceeding") pending in Canada before the

Ontario Superior Court of Justice (Commercial List) (the "Canadian Court").[2] Pursuant to the

Assignment Order (the "Assignment Order") (attached hereto as **Exhibit C**), expected to be

entered by the Court in the Canadian Proceeding (the "Canadian Court") on February 23, 2016,

and in accordance with the Approval and Vesting Order (the "Vesting Order") (attached hereto

---

[1] The last four digits of the Employer Identification Number or Canadian Business Number, as appropriate, for each debtor follow in parentheses: PT Holdco, Inc. (3731), PTUS, Inc. (0542), Primus Telecommunications, Inc. (4563), Lingo, Inc. (7778), and Primus Telecommunications Canada, Inc. (5618).

[2] The Monitor was appointed as monitor of the Debtors pursuant to provisions of Canada's Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36 (the "CCAA"), the statute under which the Debtors have been granted relief from creditors. An initial order ("Initial Order") (attached hereto as **Exhibit B**) was entered on January 19, 2016 in the Ontario Superior Court of Justice by the Honourable Mr. Justice Penny, Court File No. CV-16-11257-OOCL, In the Matter of a Plan of Compromise or Arrangement of PT Holdco, Inc., Primus Telecommunications Canada Inc., PTUS, Inc. Primus Telecommunications, Inc., and Lingo, Inc.

as **Exhibit D**) and the Stay Extension and Distribution Order (the "Distribution Order") (attached hereto as **Exhibit E**) (and, the Distribution Order, collectively with the Initial Order, the Assignment Order and the Vesting Order, the "Canadian Orders"), also set to be entered by the Canadian Court February 23, 2016, the Foreign Representative, by undersigned counsel, hereby moves this Court for entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Sale Recognition Order"), pursuant to sections 1520, 105(a), 363(b), (f), (m) and (n), 365, 1501 and 1521 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Court for the District of Delaware (the "Local Rules") recognizing, giving full force and effect to and enforcing the Canadian Orders, pursuant to which the Canadian Court has authorized, *inter alia*, the sale and transfer (the "Sale") by the Debtors of all their right, title and interest in and to substantially all of the business of the Debtors (collectively, the "Purchased Assets") to Birch Communications, Inc. (the "Purchaser"), pursuant to the Asset Purchase Agreement ("APA") by and between the Debtors and the Purchaser, dated January 19, 2016 (a copy of which is attached hereto as **Exhibit F**), free and clear of all claims, liabilities, encumbrances, except as set forth in the APA and granting certain related relief.

## JURISDICTION AND VENUE

1.    This Court has jurisdiction over these bankruptcy cases and the Motion pursuant to 28 U.S.C. §§ 157 and 1334, and the Amended Standing Order of Reference from the United States District Court for the District of Delaware, dated February 29, 2012. This matter is a core proceeding within the meaning of 28 U.S.C. §§ 157(b)(2).

2.    Venue is proper under 28 U.S.C. §§ 1410(1) and (3).

3.    The statutory bases for the relief requested herein are sections 105, 363, 365, 1501, 1517, 1519, 1520, and 1521 of Bankruptcy Code.  Relief is also warranted pursuant to Bankruptcy Rules 2002, 6004 and 9014 and Local Rule 6004-1.

## BACKGROUND

4.    On January 19, 2016 (the "Petition Date"), the Debtors made an application under the CCAA commencing the Canadian Proceeding.  On the Petition Date, the Canadian Court entered the Initial Order, *inter alia*, (i) appointing the Monitor; (ii) authorizing the Monitor to act as foreign representative in these chapter 15 proceedings; (iii) authorizing the Debtors to pursue all efforts and avenues in restructuring; (iv) prohibiting counterparties to contracts with the Debtors from terminating any and all such contracts; and (v) granting a stay of proceedings against the Debtors.

5.    On the Petition Date, the Foreign Representative, on behalf of each of the Debtors, filed their respective voluntary petitions under chapter 15 of the Bankruptcy Code (the "Chapter 15 Cases") and a Verified Petition for Recognition of Foreign Main Proceeding and Related Relief (the "Verified Petition") pursuant to section 1515 of the Bankruptcy Code seeking (i) entry of an Order recognizing the Canadian Proceeding as a foreign main proceeding pursuant to section 1517 of the Bankruptcy Code and (ii) relief under sections 1520 and 1521 of the Bankruptcy Code.  A hearing was scheduled for and occurred on January 21, 2016 (the "First Day Hearing").  At that time, the Court, *inter alia*, entered an Order: (i) scheduling a hearing on the Verified Petition for February 19, 2016; and (ii) proscribing the Notice to be used in this proceeding going forward (the "Notice Order") [D.I.12].

6.    The detailed factual background relating to the Debtors, the Foreign Representative, and the commencement of these chapter 15 cases is set forth in the Verified

Petition and the Meakin Declaration, filed on January 19, 2016 [D.I. 3 and 6, respectively]. The Foreign Representative hereby adopts and incorporates all of the factual assertions in the Verified Petition and the Meakin Declaration as if set forth fully herein.

**A.    The Prepetition Solicitation Process**

7.    As set forth more fully in the Meakin Declaration and the exhibits thereto, the Affidavit of Michael Nowlan sworn on February 2, 2016 filed in support of the Motion Re: Approval of the Sale Transaction and Assignment of Agreements, *et al.* (the "Canadian Sale Motion") (the "February 2nd Nowlan Affidavit") (attached hereto as **Exhibit G**); and the February 2, 2016 Affidavit of Jim Osler filed in support of the Canadian Sale Motion (the "Osler Affidavit") (attached hereto as **Exhibit H**), prior to the commencement of the Canadian Proceeding and the chapter 15 proceedings, the Debtors employed a sales and investment solicitation process to identify potential purchasers and/or investors (the "SISP") a copy of which can be found at Exhibit C to the February 2nd Nowlan Affidavit.

8.    The details of the events and circumstances leading up to the execution of the APA are set forth at length in the Verified Petition and documents filed in support thereof. Briefly, Primus Canada is indebted to the Bank of Montreal, HSBC Canada and ATB Corporation Financial Services (collectively, the "Syndicate") in the amount of $40,700,000 pursuant to a Credit Agreement dated July 31, 2013, such credit agreement as amended by the amending agreement dated September 23, 2014 (the "Credit Agreement"). The indebtedness of Primus Canada to the Syndicate is guaranteed by the other Debtors and secured by first ranking security over all other assets.

9.    Primus Canada is also indebted to The Manufacturers Life Insurance Company ("Manulife") and BMO Capital Partners (collectively, the "Subordinate Lenders") in the

principal amount of $20,000,000 pursuant to a subordinate credit agreement dated July 31, 2013 (such credit agreement, as amended, the "Subordinate Credit Agreement"). The indebtedness of the Subordinate Lenders is guaranteed by the other Debtors.

10. To secure the obligations to the Subordinate Lenders, the Debtors have granted a security interest to Manulife as collateral agent of the Subordinate Lenders over all their assets pursuant to, *inter alia*, a general security agreement. This security is subordinate to the security granted the Syndicate.

11. As of late 2014, the Debtors have been unable to maintain the requisite EBITDA ratios specified under the Credit Agreement (the "Credit Agreement Defaults"), and were therefore in default under the Credit Agreement. Consequently, Primus Canada entered into a forbearance agreement with the Syndicate on February 4, 2015 (the "Syndicate Forbearance Agreement").

12. Primus Telecommunications Canada, Inc. also defaulted under the Subordinate Credit Agreement (the "Subordinate Credit Agreement Defaults"). Consequently, Primus Telecommunications Canada, Inc. entered into a forbearance agreement with the Subordinate Lenders on February 4, 2015 (the "Subdebt Forbearance Agreement").

13. On August 31, 2015, following extensive and careful arms-length negotiation commencing in July 2015, Primus Canada entered into a support agreement with the Syndicate lenders (the "Support Agreement") further to which the Syndicate agreed to support the SISP on a going concern basis. Further to the timeline and conditions set out in the Support Agreement (and as set forth in greater detail in the materials filed in support of the Motion), the Debtors commenced the SISP in September 2015.

14.     The Debtors elected to pursue a SISP outside of CCAA proceedings out of concern that, *inter alia*, a prolonged period under CCAA protection necessary to implement a post-CCAA filing sales process would have a serious and detrimental impact on the Debtors' business and its customers which could diminish the value of the business as whole.  The bargain reflected in the Support Agreement was a product of meticulous balancing of interests of the Debtors' various stakeholders, the result of which was to allow the Debtors to implement their proposed restructuring strategy (i.e. the SISP) as a going concern while preserving the position of the Syndicate Lenders and the Debtors' other stakeholders if the SISP did not, ultimately, result in any restructuring transaction(s).

15.     Following a competitive selection process, Origin Merchant Partners ("Origin") was engaged by Primus Telecommunications Canada, Inc. to act as a financial advisor pursuant to an engagement letter dated August 7, 2015 (the "Engagement Letter") and commenced solicitation of potentially interested parties.

16.     As a result of the efforts of the Debtors and Origin, six interested parties emerged and submitted Phase I Bids (defined in the SISP).  Parties were subsequently invited to Phase II (as defined in the SISP).  At the conclusion of Phase II, there were five parties which submitted final proposals, with an additional offer from a sixth party provided shortly thereafter.

17.     A period of extensive and intensive arm's length negotiations followed the receipt of such offers, each of which were evaluated in accordance with the criteria enumerated in the SISP.  Ultimately, the bid by the Purchaser was determined to be the Successful Bid.

18.     As set forth in greater detail in the February 2nd Nowlan Affidavit and the Osler Affidavit, during the solicitation process, Comwave Networks, Inc. ("Comwave") submitted a bid with respect to substantially all of the Debtors' assets.  Contemporaneous with the evaluation

of the Comwave bid, the Debtors evaluated bids from five other entities. Ultimately, Comwave issued an ultimatum that was not satisfactory to the Debtors' boards in the exercise of their business judgment and Comwave's deposit was returned. Negotiations continued with the Purchaser and culminated in the execution of the APA between the Debtors and the Purchaser on January 19, 2016.

19.    As set forth in greater detail in the February 2nd Nowlan Affidavit, despite initially declining the Debtors' invitation to submit a proposal to refinance the Debtors' indebtedness to the Syndicate, Manulife subsequently expressed an interest in supporting the Debtors' refinancing in lieu of a Sale without providing any concrete refinancing alternative or firm financing commitment. Counsel for the Agent (on behalf of the Syndicate) responded to this overture and offered to sell the indebtedness to Manulife at a discount. Manulife did not respond to that offer. The Debtors continued to reach out to Manulife to advise that, due to ongoing negotiations with the various bidders, any proposed refinancing must be supported by committed financing letters as soon as possible. In ensuing correspondence, Manulife advised that it would not support a sale. After the Initial Order was entered in the CCAA proceeding, Manulife advised that it did not support the Sale and that it had concerns regarding the SISP. To date, Manulife has failed to provide any firm financing commitment or any evidence that reopening the sales process at this time would generate a better return for stakeholders.

20.    An essential precondition to the contemplated APA between the Debtors and the Purchaser was the expeditious application to this Court for the Order sought in the Verified Petition. Pursuant to Section 8.3 of the APA:

> [a]t or before Closing Time, the Vendors shall execute and
> deliver...to the Purchaser...(c) a copy of the U.S. Recognition
> Order [that] has been issued and entered, is final and shall not have
> been stayed or varied in a manner prejudicial to the Purchaser, or

vacated or appealed, unless the Purchaser has provided written consent that Closing occur despite such appeal...

21.    In advance of filing for CCAA protection, and in order to comply with the provisions of the Support Agreement detailed above, the parties entered into two preliminary agreements:

    a.    First, on December 18, 2015, the Debtors entered into an Escrow Agreement with the Purchaser and FTI Consulting Canada Inc. (as escrow agent), whereby $2,000,000 would be deposited into an escrow account in contemplation of entering into the aforementioned APA to be released as part of the closing thereof; and

    b.    Second, on December 22, 2015, the Debtors entered into an exclusivity letter agreement with the Purchaser whereby the Debtors agreed to terminate any existing discussions with any third party, and not to solicit, encourage or otherwise commence or continue discussions with, or provide any information to, any third party, regarding the sale to any such third party of all or any of the Purchased Assets or any investment or other participation by any such third party in any of the business, enterprise, securities, assets or properties of any of the Debtors. The exclusivity letter agreement was a condition precedent to the Purchaser pursuing the sale transaction contemplated in the APA.

22.    After extensive deliberations and consultations with their professional advisors, the Debtors concluded, further to and on the basis of their commercial and business judgement, that the transaction contemplated in the APA represented the best offer available to them in the circumstances and that proceeding with such transaction was in the best interest of stakeholders.

**B.    The Sale Transaction**

23.    The Debtors and the Purchaser executed and delivered the APA dated January 19, 2016, subject to Court approval.

24.    The essential terms of the definitive version of the APA and the Sale Transaction contemplated therein are as follows:

    a.    The Purchaser will acquire substantially all of the business, assets and operations of the Debtors, including principally all of their patents, patent applications, trademarks and domains ("Purchased Assets" and "Purchased

Intellectual Property" respectively, and as set out in Schedule "A" and "H" to the APA) but excluding any shares and other securities owned by any Primus Entity ("Excluded Assets", set out in Schedule "D" to the APA) on an "as is, where as" basis as existing at "Closing Time" (as defined in the APA and subject to representation and warranties therein);

b.     The aggregate purchase price ("Purchase Price") payable to the Primus Entities is calculated on the basis of the Purchase Price formula set out further to sections 3.1 and 3.7 of the APA, consisting of the following:

    i.     The "Base Purchase Price" of $44 million (as the term is defined in the APA and as adjusted in accordance with the formula set out therein);

    ii.     Less certain Cure Costs (as defined in the APA); and

    iii.     Less certain other amounts payable that do not constitute Cure Costs in respect of "Essential Contracts" (as defined in the APA).

c.     The Purchaser may, in its sole discretion, offer employment to any or all active and inactive Primus Entity employees (collectively "Transferred Employees") conditional on "Closing" (as each is defined in the APA);

d.     The Purchaser will assume, perform, discharge and pay the obligations of the Primus Entities ("Assumed Obligations") set out in section 2.5 of the APA, including, but not limited to, the following:

    i.     all debts, liabilities and obligations under an "Assumed Contract" assigned or transferred to the Purchaser on Closing for the period from and after Closing Time, provided that such debts, obligations or liabilities do not arise from or are due or attributable to:

        1.     any default existing or breach by any Debtor occurring prior to or as a consequence of Closing, or

        2.     any default, breach or violation of any Debtors of any term or condition of the APA;

    ii.     all debts, liabilities and obligations for which the Purchaser is responsible in respect of Transferred Employees as per the APA.

25.     The Purchaser may terminate the APA, in its sole and absolute discretion, if the Canadian Court orders a post-filing sales process or it may elect not to terminate the APA and have it serve as a the stalking horse offer in such post-filing sales process with customary

stalking horse protections, in accordance with the terms of the exclusivity letter arrangement (which are to include, without limitation, a 3% break-free to be paid from the proceeds of any overbid in favor of the Purchaser), subject to court approval. As of the date hereof, the Purchaser's position is that it does not consent to a post-filing sales process and should a post-filing process be ordered, there is no assurance that the Purchaser would participate in such process or allow its bid to stand as stalking horse.

26.     The APA specifies the assets of the Debtors which will be acquired by the Purchaser. With the exception of the Excluded Assets as set forth in Section 1.1 of and Schedule D to the APA and along with the Excluded Contracts as set forth in Schedule E to the APA, the entirety of the Debtors' assets is being sold to the Purchaser.

27.     The shares of each of the Debtors, including all of the shares of Primus Telecommunications, Inc., Lingo, Inc. and Primus Telecommunications Canada, Inc. and other Excluded Assets as set forth in Schedule D to the APA and the interests of the Debtors in a limited number of Excluded Contracts identified in Schedule E to APA are not being sold. The only excluded contracts which impact assets located within the territory of the United States involve leases of office space in Florida and Iowa.

28.     The Debtors do not intend to take any further action with respect to the Excluded Contracts.

29.     The Canadian Court is expected to authorize the Monitor to make an immediate distribution from the cash purchase price paid by the Purchaser as a payment (i) on account of the indebtedness currently outstanding to the Syndicate (as defined in the Distribution Order), (ii) of amounts owing to Origin under their engagement letter, and (iii) of Professional Expenses and Post-Filing Expenses (as each term is defined in the Distribution Order). *See* Distribution Order

at ¶4. If the Sale is approved and closes, the Monitor shall distribute cash up to the maximum amount of the Syndicate's secured obligations but in each case subject to the maintenance of a holdback in the amount satisfactory to the Monitor or as may be ordered by the Canadian Court.

30.    The APA contemplates that the transfer of the Regulated Customer Relationships (as defined in the APA) in the United States will take place after Closing and upon the necessary Federal Communications Commission or State Public Utility Commission consents have been obtained. During that interim period (up to a maximum of six (6) months), the Debtors and the Purchaser will entered into a Management Agreement wereby the Purchaser will manage the Regulated Customer Relationships.  Following Close, within ten (10) business days of the last day of each month, the Purchaser will provide the Monitor with a written statement confirming the consents that were received in the previous month for the Regulated Customer Relationships. Upon receipt of that written statement, the Monitor will release from the Customer Relationship Escrow (as defined in the APA) the amount attributable to the Regulated Customer Relationships transferred the previous month.  After six (6) months, to the extent any monies remain in the Regulated Customer Escrow, they are to be returned to the Purchaser.  *See* APA at sections 2.4 and 3.2 and Schedule K and Vesting Order at ¶¶ 4-6.

**C.    Local Rule 6004-1 Disclosures**

31.    In accordance with Local Rule 6004-1, set forth below are certain provisions in the APA and/or the Sale Recognition Order that such rule requires the Foreign Representative to highlight in this Motion.

| Highlighted Provision | Description | Location in Sale Recognition Order and/or APA |
|---|---|---|
| Sale to Insider | The Purchaser is not an insider as defined by Bankruptcy Code section 101(31). | |

| Management Agreements | The Purchaser intends to hire substantially of the existing employees of the Debtors. | APA at Article 4. |
|---|---|---|
| Releases | The Sale will be free and clear of all interests other than the Permitted Encumbrances.<br><br>The Purchaser will not be liable to any of the Debtors or any predecessor or successor to any of the Debtors arising out of the Sale and/or APA except as set forth in the Canadian Orders. | Sale Recognition Order at ¶7.<br><br><br>Vesting Order at ¶4. |
| Private Sale/No Competitive Bidding | The Sale is a private sale. The APA is not subject to a higher and better offer.[3]<br><br>Through this Motion, the Foreign Representative seeks approval, enforcement and recognition of the Sale set to be approved by the Canadian Court on February 23, 2016. | Sale Recognition Order at ¶2. |
| Closing and Other Deadlines | | Sale Recognition Order at ¶¶6-12. |
| Good Faith Deposit | $2,000,000 was deposited by Purchaser. | |
| Interim Agreements with the Purchaser | Interim Management Agreement and Escrow Agreement | Schedule J to APA. |
| Use of Proceeds | At Closing, the Monitor shall distribute (i) cash up the maximum amount of the Syndicate's secured obligations but in each case subject to the maintenance of a holdback in the amount satisfactory to the or further order of the Canadian Court; | Distribution Order at ¶4. |

---

[3] As set forth above and in the Meakin Declaration and February 2nd Nowlan Affidavit (and the exhibits thereto), the Sale is the result of a thorough solicitation and sale process conducted by Origin that has extended over many months. As set forth in the Canadian Proceeding, the Monitor believes that this process, resulting in the APA with the Purchaser, was fair and reasonable.

| | (ii) amounts owing to Origin under their engagement letter; (iii) Professional Expenses and Post-Filing Expenses (as each term is defined in the Distribution Order) and (iv) costs to administer the CCAA and chapter 15 proceedings. | |
|---|---|---|
| Tax Exemption | None. The Purchaser has not agreed to assume any liabilities that might arise as a consequence of any cancellation of indebtedness income and, to the extent that any such liabilities arise, the Debtors will have no funds available to pay such tax obligations. | APA at section 3.6 |
| Record Retention | The Debtors will be selling substantially all of their assets. The APA does contemplate post-Closing work for the transfer of Regulated Customer Relationships in the United States for up to six (6) months. | APA at section 2.4 and Schedule J. |
| Sale of Avoidance Actions | N/A. | |
| Requested Findings as to Successor Liability | To the extent permissible under the Canadian Orders, the Purchaser or its affiliates, members or shareholders shall not be deemed, as a result of any action taken in connection with the Sale or the Purchaser's post-closing use or operation of the Purchased Assets to: (a) be a successor to the Debtors; (b) have, de facto or otherwise, merged or consolidated with or into the Debtors; (c) be a continuation or substantial continuation of the Debtors or any enterprise of the Debtors, based on any theory, including based on any | Sale Recognition Order at ¶8. |

|  | theory of antitrust, environmental, labor law, alter ago, veil piercing, continuity of enterprise, mere continuation, produce line, de facto merger or substantial continuity. |  |
|---|---|---|
| Sale Free and Clear of Unexpired Leases | N/A |  |
| Credit Bid | N/A |  |
| Relief from Bankruptcy Rule 6004(h) | Yes | Sale Recognition Order at ¶21. |

## RELIEF REQUESTED

32.     By this Motion, the Foreign Representative respectfully requests that this Court enter the Sale Recognition Order, substantially in the form annexed hereto as **Exhibit A** pursuant to sections 105(a), 1501, 1520 and 1521 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004 and 9014 and Local Rule 6004-1 and section 363 (b), (f), (m) and (n) of the Bankruptcy Code as made applicable by section 1520(a)(2) of the Bankruptcy Code: recognizing, giving full force and effect to and enforcing the Initial Order, the Assignment Order, the Distribution Order and the Vesting Order and granting certain related relief.

33.     The Foreign Representative believes that the Sale of the Purchased Assets in accordance with the terms and conditions of the APA, the Canadian Orders and the Sale Recognition Order is fair and reasonable under the circumstances.  Pursuant to sections 7.1 and 8.3 of the APA, entering of the Sale Recognition Order, substantially in the form annexed hereto, is a condition precedent to the consummation of the Sale.  This Court's recognition and enforcement of the Canadian Orders will permit the Debtors to sell the Purchased Assets without disruption and in a timely and efficient manner.  Absent the relief requested herein, the Debtors,

their creditors and their employees will potentially suffer significant, if not irreparable, harm due

to an inability to close the Sale.

## BASIS FOR RELIEF REQUESTED

### A.    The Court Should Recognize and Enforce the Canadian Orders

34.    Pursuant to section 1520(a) of the Bankruptcy Code, upon the Court's recognition

of the Canadian Proceeding as a foreign main proceeding:

> (2) section[] 363…appl[ies] to a transfer of an interest of the
> debtor in property that is within the territorial jurisdiction of the
> United States to the same extent that the section[] would apply to
> property of an estate; (3) unless the court orders otherwise, the
> foreign representative may exercise the rights and powers of a
> trustee under and to the extent provided by section[] 363…

35.    Further, recognition and enforcement of the Assignment Order, Distribution

Order and Vesting Order will provide relief that is consistent with that provided by section 363

of the Bankruptcy Code, made operable by this Court's recognition of the Canadian Proceeding

as a foreign main proceeding under section 1520(a) of the Bankruptcy Code.[4]

---

[4] Section 363(b)(1) provides, in relevant part, that a debtor "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363 (b)(1). Section 363 of the Bankruptcy Code does not set forth a standard for determining when it is appropriate for a court to authorize the sale or disposition of a debtor's assets prior to confirmation of a plan. However, courts in this Circuit and in other districts have required that the decision to sell assets outside the ordinary course of business be based upon the sale proponent's sound business judgment. *See Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (D. Del. 1999); *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 176 (D.D.C. 1991); *see also In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143 (3d Cir. 1986); and *Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996). The "sound business judgment" test requires a proponent of a sale to establish four elements in order to justify the sale of property outside the ordinary course of business. These factors are (a) that a "sound business purpose" justifies the sale of assets outside the ordinary course of business; (b) that adequate and reasonable notice has been provided to interested person; (c) that the trustee or debtor in possession has obtained a fair and reasonable price; and (d) that the purchaser has acted in good faith. *See In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143; *In re Exaeris Inc.*, 380 B.R. 741, 744 (Bankr. D. Del. 2008); *Titusville Country Club v. Pennbank (In re Titusville Country Club)*, 128 B.R. 396, 399 (Bankr.

36.    In addition, granting the requested relief is in the public interest as described as a substantial part of the purpose of chapter 15 of the Bankruptcy Code. *See* 11 U.S.C. § 1501(a).

37.    Courts in this District have granted relief similar to the relief request in this Motion. *See, e.g. In re Thane International, Inc.*, Case No. 15-12186 (KG) (Bankr. D. Del. Dec. 1, 2015) (recognizing and enforcing sale order entered by Canadian court and separately authorizing and approving sale free and clear of any and all liens, claims, encumbrances and other interests under section 363 of the Bankruptcy Code); *Xchange Technology Group LLC*, Case No. 13-12809 (KG) (Bankr. D. Del. Nov. 25, 2013) (recognizing and enforcing sale order entered by Canadian court and separately authorizing and approving sale free and clear of any and all liens, claims, encumbrances and other interests under section 363 of the Bankruptcy Code and approving the assignment of assumed contracts); *Arctic Glacier International Inc.*, Case No. 12-10605 (KG) (Bankr. D. Del. July 17, 2012) (same); *In re Earthview IP Holdings LLC*, Case No. 10-13363 (CSS) (Bankr. D. Del. Feb. 18, 2011) (recognizing and enforcing sale order entered by Canadian court and separately authorizing and approving the sale free and clear of any and all liens, claims, encumbrances and other interests under section 363 of the Bankruptcy

---

W.D. Pa. 1991); and *In re Sovereign Estates, Ltd.*, 104 B.R. 702, 704 (Bankr. E.D. Pa. 1989). In this case, ample business justification exists to sell the Purchased Assets to the Purchaser. The Sale satisfies all four conditions set forth in *Abbotts Dairies*. First, sound business purposes justify the Sale. The Sale presents the best opportunity for the Debtors to maximize the value of their assets. Approval of the Sale will permit the Debtors' business to continue and its suppliers, employees and customers to have the benefit of continuing contracts, jobs and services. Moreover, the consideration received by the Debtors in connection with the Sale represents fair value for the relevant assets to be transferred. Second, in light of the Sale process that the Debtors have undertaken to date, adequate and reasonable notice of the proposed Sale has been provided to interested persons. Moreover, all known creditors. Third, the Purchase Price represents a fair and reasonable price for the Purchased Assets. To be sure, the Purchase Price, which is in excess of $44 million, far exceeds the highest amount previously offered by a potential purchaser during the Pre-CCAA filing marketing process. Fourth, the negotiation process undertaken with respect to the APA satisfies the good faith requirement. Indeed, the APA is the product of good faith and arm's length negotiations among the parties.

Code); *In re Grant Forest Products*, Case No. 10-11132 (PJW) (Bankr. D. Del. Apr. 26, 2010) (same); *In re Destinator Technologies, Inc.*, Case No. 08-11003 (CSS) (Bankr. D. Del. July 8, 2008) (same).

38.     This Court's recognition and enforcement of the Canadian Orders is not only warranted, but is critical to achieving the anticipated results of the Sale, as it will permit the Debtors to sell the Purchased Assets without disruption and provide further certainty to the Sale and to the Purchaser.  As noted above, entry of the Sale Recognition Order, recognizing and enforcing the Vesting Order, is a condition precedent to the consummation of the Sale.  Absent the relief requested herein, the Debtors may suffer substantial, if not irreparable, harm from the inability to sell the Purchased Assets without interference and in a manner that will allow the Debtors to maximize recoveries for all creditors and stakeholders.

39.     For all of the foregoing reasons, the Foreign Representative respectfully submits that there is more than ample justification for this Court to enter the Sale Recognition Order, thereby recognizing and enforcing the Canadian Orders, consistent with section 1520(a) of the Bankruptcy Code.

**B.      The Court Should Recognize the Sale Free and Clear of Interests and Successor Liability**

40.     The Foreign Representative also respectfully requests recognition and enforcement of the Canadian Orders, through section 363 as made applicable by section 1520(a)(2) of the Bankruptcy Code, this Court recognize and enforce the Sale free and clear of interests (as defined in the Sale Recognition Order).  Upon recognition of the Canadian Proceeding as a foreign main proceeding, such recognition and enforcement of Canadian Orders is appropriate and consistent under section 1520(a) of the Bankruptcy Code, which operates to

apply section 363 of the Bankruptcy Code.[5]  A sale of the Purchased Assets other than one free

and clear of all interests, other than Permitted Encumbrances provided (and as defined) in the

APA, could yield substantially less value for the Debtors and their creditors than the Sale and is

consistent with section 363 of the Bankruptcy Code, made operably by section 1520(a) of the

Bankruptcy Code.  Therefore, a sale free and clear of all Interests is in the best interests of the

Debtors, their creditors and other parties in interest and is consistent with the Bankruptcy Code.

41.     Additionally, the recognition and enforcement of the Canadian Orders would also

be consistent with section 363(f) of the Bankruptcy Code with respect to any creditors that may

assert an Interest in the Purchased Assets:  the Foreign Representative submits that at least one of

the subsections of 363(f) of the Bankruptcy Code applies to such creditors and, in most cases,

more than one of such subsections is satisfied.  Notably, the Syndicate has consented to the Sale.

Accordingly, the Foreign Representative submits that the sale of the Purchased Assets free and

clear of all Interests, other than as provided in the APA, satisfies the statutory prerequisites of

---

[5] Under section 363(f) of the Bankruptcy Code, a trustee or debtor in possession may sell all or
any part of a debtor's property free and clear of any and all liens, claims, encumbrances and
other interests in such property if (i) such a sale is permitted under applicable non-bankruptcy
law; (ii) the party asserting such a lien, claim or interest consents to such a sale; (iii) the interest
is a lien and the purchase price for the property is greater than the aggregate amount of all liens
on the property; (iv) the interest is the subject of a bona fide dispute; or (v) the party asserting the
lien, claim or interest could be compelled, in a legal or equitable proceeding, to accept a money
satisfaction for such interest. *See* 11 U.S.C. § 363(f); *In re P.K.R. Convalescent Ctrs., Inc.*, 189
B.R. 90, 93-94 (Bankr. E.D. Va. 1995) ("[Section] 363 covers more situations than just sales
involving liens...Section 363(f) addresses sales free and clear of any interest..."); *Citicorp
Homeowners Serv., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988) (noting that
section 363(f) of the Bankruptcy Code is written in the disjunctive; therefore, a court may
approve a sale "free and clear" provided at least one of the subsections is met).  In addition, a
court may authorize the sale of a debtor's assets free and clear of any liens, claims or
encumbrances under section 105 of the Bankruptcy Code.  *See Volvo White Truck Corp. v.
Chambersburg Beverage, Inc. (In re White Motor Credit Corp.)*, 75 B.R. 944, 948 (Bankr. N.D.
Ohio 1987) ("Authority to conduct such sales [free and clear of liens] is within the court's
equitable powers when necessary to carry out the provisions of Title 11.").

section 363(f) of the Bankruptcy Code and, therefore, recognition and enforcement of the Canadian Orders is consistent with the Bankruptcy Code.

42.    In recognizing and enforcing the Canadian Orders, the Foreign Representative is respectfully seeking that this Court recognize and enforce the Sale of the Purchased Assets to the Purchaser free and clear of claims based upon successor liability. In this way, the Purchaser will obtain increased certainty concerning the Excluded Liabilities as to the Purchased Assets in the United States. The Foreign Representative submits that the relief requested herein is an appropriate exercise of this Court's authority under chapter 15 of the Bankruptcy Code.[6]

**C.    This Court Should Recognize the Canadian Court's Authorization to Assign the Essential Contracts to the Purchaser**

43.    The APA requires, as a condition precedent to the Sale, the assignment of the Essential Contracts (as defined in the APA), which will be assigned through the Assignment Order. *See* APA at Schedule B. Moreover, through the Vesting Order, the Canadian Court will approve the APA. *See* Vesting Order at ¶12. Specifically, the Vesting Order, *inter alia*, authorizes the Debtors to enter into the APA and provides that the Debtors are to fulfill the conditions of the APA and further provides, once the Sale closes, that the Monitor is to hold the monies as prescribed by the Canadian Court. *Id.* at ¶¶ 5-8. Finally, the Initial Order expressly prohibits parties to contracts from failing to perform or otherwise attempting to terminate such

---

[6] It is well established that a bankruptcy court has the power under section 363(f), made operable by section 1520(a) of the Bankruptcy Code upon this Court's recognition of the Canadian Proceeding as a foreign main proceeding, to approve the sale of a debtor's assets free and clear of successor liability claims against the debtor. *In re TWA Airlines, Inc.*, 322 F.3d 282, 288-290 (3d Cir. 2003) (holding that successor liability claims are "interests in property" within the meaning of section 363(f) of the Bankruptcy Code); *United Mine Workers of Am. Benefit Plan v. Leckie Smokeless Coal Co. (In re Leckie Smokeless Coal Co.)*, 99 F.3d 573 (4th Cir. 1996) (same).

contracts without leave of the Canadian Court. *See* Initial Order at ¶17 and Assignment Order at ¶7.

44.     As set forth in further detail *supra*, it is an appropriate exercise of business judgment for the Debtors to agree to assign the Essential Contracts as required under the APA and the CCAA specifically provides for the assignment of contracts through an Order of the Canadian Court.    Additionally, the Foreign Representative submits that the notice and protections for counterparties set forth in the Canadian Orders and implemented in the Canadian Proceeding are adequate to protect the rights of counterparties to the contracts from and after the date of assignment and are consistent with the relief typically afforded to debtors and purchasers under sections 363 and 365 of the Bankruptcy Code.    Moreover, the Purchaser has indicated that it is able and has agreed to assume and perform the obligations of the Debtors under the Essential Contracts in accordance with their terms.    As such, the Foreign Representative respectfully submits that recognition and enforcement in the United States of the Canadian Orders, specifically with regard to the assignment of the Essential Contracts to the Purchaser, does not present any public policy conflict or any issue concern protection of the interests of the parties to the Essential Contracts that would prevent this Court from entering the Sale Recognition Order.

**D.     The Court Should Afford the Purchaser All Protections Consistent With Sections 363(m) and (n) of the Bankruptcy Code as a Good Faith Purchaser**

45.     In addition to the relief requested above, in recognizing and enforcing the Canadian Order, the Foreign Representative requests that this Court provide the Purchaser with the protections consistent with those set forth in sections 363(m) and (n) of the Bankruptcy Code. The Vesting Order expected to be entered by the Canadian court provides: "[T]he actions of the Primus Entities and their advisors, including Origin [ ] and FTI Consulting Canada Inc., in developing and implementing the SISP and entering into the Sale Agreement and any ancillary

agreements are approved *nunc pro tunc*...and the activities of the proposed monitor and the Monitor described [in the Pre-filing Report of FTI Consulting Canada Inc., in its capacity as proposed monitor, and the First Report of the Monitor] are hereby approved. *See* Vesting Order at ¶¶16-17.[7]

    i.    <u>Objecting Parties</u>

45.    As set forth in greater detail *supra* and in the February 2nd Nowlan Affidavit and the Osler Affidavit, Comwave, an unsuccessful bidder and Manulife, the agent for the Subordinate Lenders, had previously indicated that they may object to the Sale in the Canadian proceedings. Following the Petition Date and notwithstanding the stay of proceedings, Comwave commenced an action against the Debtors, Origin, FTI Consulting Canada Inc. and FTI Consulting Canada ULC on the basis of allegations in connection with the SISP. Since that time and based on discussions with counsel to Comwave and Manulife, the Foreign Representative believes that neither Comwave nor Manulife will be objecting to the Sale in the Canadian Proceeding and that Comwave will be discontinuing its action. In any event, the Sale Recognition Order sought herein will only be sought if the Canadian Orders have been issued

---

[7] Specifically, section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m). While the Bankruptcy Code does not define "good faith," courts have stated that "the phrase encompasses one who purchases in 'good faith' and for 'value.'" *In re Abbots Dairies of Pa.*, 788 F.2d at 147. Courts have held that in order to demonstrate a lack of good faith, a party would have to show "fraud or collusion between the purchaser and [seller] or an attempt to take grossly unfair advantage [of other potential purchasers]." *Id.*

and entered. If the Canadian Orders have been issued and entered, objections thereto, would have been denied by the Canadian Court.

46.     As described in the Meakin Declaration, the APA was negotiated without fraud or collusion, in good faith and from an arm's length bargaining position. The Foreign Representative has no reason to believe that any of the Debtors have entered into the APA for the purpose of hindering, delaying or defrauding present or future creditors of the Debtors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof or the District of Columbia. Accordingly, the Foreign Representative seeks recognition and enforcement of the Canadian Orders, consistent with a finding that the Purchaser is a good faith purchaser under section 363(m) of the Bankruptcy Code and has not violated section 363(n) of the Bankruptcy Code.

## WAIVER OF RULE 6004(h)

47.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale or lease of property…is stayed until the expiration of fourteen (14) days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). The Foreign Representative requests that the Sale Recognition Order, once entered, be effective immediately by providing that, to the extent applicable, the fourteen (14) day stay under Bankruptcy Rule 6004(h) is waived.

48.     The purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for an objecting party to appeal before an order can be implemented. *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(h). Although Bankruptcy Rule 6004(h) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the fourteen (14) day stay period, commentators have suggested that the fourteen (14) day stay period should be eliminated to allow a sale or other transaction to close immediately "where there have been no

objection to the procedure." 10 COLLIER ON BANKRUPTCY, ¶6004.11 (L. King, 16[th] rev. ed. 2011) and the Canadian Court is set to approve the Sale on February 23, 2015. There is no deadline for objections in the CCAA Proceedings. However, as set forth above, the Foreign Representative does not anticipate objections to the Canadian Orders.

49.     Time is of the essence with respect to the Sale Recognition Order.

50.     Accordingly, the Foreign Representative hereby respectfully requests that the Court waive the fourteen (14) day stay period under Bankruptcy Rule 6004(h).

## NOTICE

51.     Pursuant to the Notice Order, the Foreign Representative served the following core parties (collectively, the "Core Notice Parties") with all pleadings in these cases via Canada Post first-class mail, United States first-class mail, facsimile, e-mail, overnight courier or personal delivery: (i) counsel to the Agent of the Syndicate Lenders (as defined in the Verified Petition); (ii) counsel to the Subordinate Lenders (as defined in the Verified Petition); (iii) counsel to the Purchaser (as defined in the Verified Petition); (iv) Internal Revenue Service; (v) counsel to the Debtors in the Canadian Proceedings; (iv) the Debtors; (vii) the Office of the United States Trustee for the District of Delaware; (viii) the Federal Communications Commission; (ix) the Office of the United States Attorney for the District of Delaware; (x) the Delaware Secretary of State; (xi) the Delaware State Treasury; and (xii) any party that files a notice of appearance in these chapter 15 Cases. Pursuant to the Notice Order, the Foreign Representative further served the following notice parties (collectively the "Notice Parties") by Canada Post first-class mail, United States first-class mail, facsimile, e-mail, overnight courier or personal delivery: (i) all entities against whom provisional relief is being sought under section 1519 and (ii) all known U.S. creditors of the Debtors with claims in excess of $1,000 other than

employees.  Finally, pursuant to the Notice Order, Notice was permitted via publishing all

documents      filed      in      this      proceeding      on      the      Monitor's      website:

http://cfcanada.fticonsulting.com/primus/default.htm.   The Notice served as described herein

stated, in part: "[t]he Recognition Hearing will address the [Verified Petition] and other matters

related to the CCAA proceedings, including possible recognition of any motions made to

approve the **proposed sale of substantially all of the Debtors' assets**.  The Debtors will file any

related motions on or before January 30, 2016." *See* Notice of Filing and Hearing on Verified

Petition of a Foreign Main Proceeding and Related Relief attached hereto as **Exhibit I** (emphasis

added).  The Foreign Representative was unable to meet the January 30th date by which to file

the Sale Recognition Motion due to the previously described adjournments and scheduling issues

with the Canadian Court.  Additionally, all of the CCAA materials were posted on the Monitor's

website on January 19, 2016 and the United States-based creditors were pointed to the website

for information regarding the Canadian Proceeding.  Finally, all of the pleadings filed in these

chapter 15 cases have been and will continue to be posted on the Monitor's website.

52.     Similarly, this Motion (including all exhibits hereto) will be served substantially

contemporaneously with the filing of this Motion on: (i) the Core Notice Parties; (ii) any party

with a security interest in the Debtors' assets located within the territory of the United States

impacted by the Sale which interest is evidenced by a filing of such security interest with the

appropriate agency for filing under the Uniform Commercial Code in the United States; (iii) all

counterparties to contracts to be assigned under the Assignment Order; and (iv) all counterparties

to contracts involving assets located within the territory of the United States which contracts are

excluded contracts and are not to be assumed by the Purchaser.  Pursuant to the Notice sent out

on January 23, 2016, all known creditors with claims in excess of $1,000 have received notice of

the possibility of a Sale Recognition Motion and therefore, the Foreign Representative respectfully submits, they do not require additional notice and no further notice is appropriate.

53. For all the reasons set forth in the Notice Motion, the Foreign Representative submits that no other or further notice is needed.

## NO PRIOR REQUEST

54. No prior request for the relief sought in this Motion has been made to this or any other court.

## CONCLUSION

WHEREFORE, the Foreign Representative respectfully requests that the Court enter the Sale Recognition Order, substantially in the form annexed hereto as **Exhibit A**, granting (i) recognition and enforcement of the Canadian Orders; and (ii) such other and further relief as the Court may deem proper.

Dated: February 11, 2016           ELLIOTT GREENLEAF, P.C.
       Wilmington, Delaware

Rafael X. Zahralddin-Aravena (DE No. 4166)
Shelley A. Kinsella (DE No. 4023)
Kate Harmon (DE No. 5343)
1105 N. Market St., Ste. 1700
Wilmington, DE 19801
Telephone:    (302) 384-9400
Facsimile:    (302) 384-9399
Email:        rxza@elliottgreenleaf.com
Email:        sak@elliottgreenleaf.com
Email:        khh@elliottgreenleaf.com

*Attorneys for the Foreign Representative*